

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

May 7, 2011

<u>**BY HAND**</u>                                    <u>**Sentencing Memorandum**</u>

The Honorable William H. Pauley III
United States District Court
Southern District of New York
500 Pearl Street, Suite 2210
New York, New York  10007

      Re:  <u>**United States**</u> v. <u>**David Eduardo Helmut Murcia Guzman**</u>,
         **S1 09 Cr. 110 (WHP)**

Dear Judge Pauley:

      The Government respectfully submits this letter in advance of the sentencing of the defendant David Eduardo Helmut Murcia Guzman, scheduled for May 23, 2011 at 2:30 p.m.  For the reasons that follow, a sentence within the Guidelines range of 108 to 135 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing under Title 18, United States Code, Section 3553(a).

<u>**Factual Background**</u>

      In 2003, David Murcia-Guzman created an organization in Colombia named "DMG" (using his initials) as a vehicle for a multi-level marketing scheme, through which customers could buy pre-paid debit cards to purchase electronics and other items at retail stores operated by DMG.  (Presentence Investigation Report dated Jan. 31, 2011 ("PSR") ¶ 18).  DMG sold its prepaid debit cards to customers in Latin America, who in turn acted as affiliated salespeople for DMG.  (PSR ¶ 18).  In exchange for its debit cards, DMG received large quantities of cash in the form of Colombian pesos from its Latin American customers.  (PSR ¶ 18).  Over the years, Murcia, with the help of his co-defendants Margarita Leonor Pabon Castro, William Suárez-Suárez, Daniel Angel Rueda, Santiago Barranchuk, and German Serrano, established hundreds of subsidiary and affiliated companies linked to DMG in countries including Colombia, Panama, Mexico, and the United States.  (PSR ¶¶ 18-19).  By 2008, DMG's customers numbered

Hon. William H. Pauley III
May 7, 2011
Page 2

approximately 400,000 and the DMG entities found themselves with vast stores of cash pesos in Colombia that the Colombian banking system would not deposit because it viewed the funds as obtained pursuant to a collections scheme illegal under Colombian law. (PSR ¶ 24).  Some of the cash pesos collected by the DMG entities came from individuals working for narcotics trafficking organizations in Colombia.  (PSR ¶¶ 24-26).

Murcia, as the leader and principal of DMG, and other of the co-defendants helped create and execute a plan to launder these illegally-obtained funds through bulk cash transfers and wire transfers both in and outside of Colombia.  Specifically, Murcia and others authorized individuals affiliated with DMG to pick up bulk cash shipments of additional illegally-generated proceeds in U.S. dollars, including proceeds generated from narcotics trafficking, in, among other places, Mexico, which were laundered and redistributed through Mexican banks and the operation of the so-called "black market peso exchange" ("BMPE"), an informal value transfer system commonly used to launder illicitly-obtained dollars in the United States, in exchange for pesos taken in for "legitimate" purchases as part of DMG's principle business model in Colombia.  (PSR ¶¶ 27-33).  Thus, DMG was able to essentially trade away cash pesos it was unable to deposit in Colombia in exchange for overseas value.

As part of this sizable money laundering conspiracy, DMG also invested proceeds in properties in, among other places, Florida, and deposited funds into U.S. accounts.  (PSR ¶¶ 23, 45-47).

In the fall of 2007, Murcia and Pabon approached another individual in Colombia "CS-1", and told CS-1 that they had cash - which turned out to be U.S. dollars – that they could not deposit into the Colombian banking system; Murcia and Pabon asked CS-1 to set up an account in the United States in which these funds could be deposited.  (PSR ¶ 34).  Acting on these instructions, CS-1 opened an account at Merrill Lynch in the United States, under the name "Blackstone International Development" (the "Merrill Lynch Account").  Neither Murcia nor Pabon were listed as owners of the Merrill Lynch Account.  (PSR ¶ 35).

In March 2008, Murcia and Pabon provided approximately $2.2 million worth of Colombian Pesos to German Serrano in Colombia, and, in exchange, Serrano caused the approximately $2.2

Hon. William H. Pauley III
May 7, 2011
Page 3

million to be wired into the Merrill Lynch Account.  (PSR ¶¶ 36-
37).  In approximately eighteen separate wire transfers between
March 11, 2008 and May 9, 2008, a total of $2,188.727.86 in U.S.
dollars was deposited into the Merrill Lynch Account.  (PSR ¶¶
36-37).  In May 2008, the United States Government seized
$2,188.727.86 from the Merrill Lynch Account pursuant to a court
order.  (PSR ¶ 38-39).

        Murcia Guzman and his co-defendants affiliated with DMG
also coordinated the pick-up and transportation of millions of
dollars in narcotics proceeds in Mexico.  (PSR ¶¶ 40-44).

        On March 17, 2009, a grand jury sitting in this
District returned one-count superseding indictment S1 09 Cr. 110
(WHP) (the "Indictment"), which charged Murcia and his co-
defendants with conspiring to commit money laundering.  (PSR
¶¶ 1-2).

        Murcia is presently remanded.

                    **Murcia's Guilty Plea and the Plea Agreement**

        On or about November 23, 2010, Murcia pled guilty to
the one count Indictment, pursuant to a plea agreement.  (PSR
¶ 5).  Count One charged Murcia Guzman with conspiracy to commit
money laundering from in or about March 2007, up to and including
in or about November 2008, in violation of Title 18, United
States Code, Section 1956(h).  Count One carries a maximum
sentence of 20 years' imprisonment, a maximum term of 3 years'
supervised release, a maximum fine of not more than $500,000 or
twice the value of the property involved in the transaction,
whichever is greater, pursuant to Title 18, United States Code §
1956(a)(1), and a mandatory $100 special assessment.

        Under the terms of the plea agreement, Murcia
stipulated that the Guidelines range is 108 to 135 months, as set
forth below:

        Offense Level

        •    The base offense is 8, pursuant to U.S.S.G. §
             2S1.1(a)(2);

        •    Because the value of the laundered funds is more
             than $2,500,000, the offense level is increased by

Hon. William H. Pauley III
May 7, 2011
Page 4

18 levels, pursuant to U.S.S.G. §§ 2B1.1(b)(1)(J) and 2S.1.1(a)(2);

- Because the defendant was convicted under 18 U.S.C. § 1956, the offense level is increased by 2 levels, pursuant to U.S.S.G. § 2S1.1(b)(2)(B);

- Because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, the offense level is increased by 4 levels, pursuant to U.S.S.G. § 3B1.1(a);

- Because U.S.S.G. § 2S1.1(b)(2)(B) applies and the offense involved sophisticated laundering, the offense level is increased by 2 levels, pursuant to U.S.S.G. § 2S1.1(b)(3);

- Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a).  Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, an additional 1-level reduction is warranted, pursuant to U.S.S.G. § 3E1.1(b), because the defendant will have given timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently; and

- In accordance with the above, the applicable Guidelines offense level is 31.

Criminal History

- None.

Hon. William H. Pauley III
May 7, 2011
Page 5

### Sentencing Range

- Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 108 to 135 months (the "Stipulated Guidelines Range").

(Plea Agreement dated November 17, 2010).  Probation's Guidelines calculation mirrors the one stipulated to by the parties.  (PSR ¶ 5).

## Discussion

### A.   General Legal Principles Applicable to Sentencing

The Guidelines continue to provide strong guidance to the Court in light of United States v. Booker, 543 U.S. 220 (2005) and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory.  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark."  Gall v. United States, 128 S. Ct. 586, 596 (2007).  As the Second Circuit noted en banc, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice."  United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).  The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," Rita v. United States, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," Gall, 128 S. Ct. at 594; see also Rita, 127 S. Ct. at 2464.

After determining the Guidelines range, a sentencing judge must look to Title 18, United States Code, Section 3553(a).  Gall, 128 S. Ct. at 596-97.  That statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)   to afford adequate deterrence to criminal conduct;

Hon. William H. Pauley III
May 7, 2011
Page 6

    (C)    to protect the public from further crimes of the
              defendant; and

    (D)    to provide the defendant with needed educational
              or vocational training, medical care, or other
              correctional treatment in the most effective
              manner.

18 U.S.C. § 3553(a)(2).  The statute instructs judges to consider
the purposes of sentencing and the following factors: "the nature
and circumstances of the offense and the history and
characteristics of the defendant," 18 U.S.C. § 3553(a)(1); "the
kinds of sentences available," id. at § 3553(a)(3); the
Guidelines range itself, see id. at § 3553(a)(4); any relevant
policy statement by the Sentencing Commission, see id. at
§ 3553(a)(5); "the need to avoid unwarranted sentence disparities
among defendants," id. at § 3553(a)(6); and "the need to provide
restitution to any victims," id. at § 3553(a)(7).

    **B.    A Sentence Within the Stipulated Guidelines Range of
        108 to 135 Months' Imprisonment Is Sufficient But Not
        Greater Than Necessary to Address the Sentencing
        Objectives under 18 U.S.C. § 3553(a)**

        Applying those considerations here, the Government
respectfully submits that a sentence within the Stipulated
Guidelines Range of 108 to 135 months' imprisonment is
sufficient, but not greater than necessary, to meet the
legitimate purposes of sentencing, and that the Court should
impose a sentence within the Stipulated Guidelines Range in order
to reflect the seriousness of the offense, promote respect for
the law, provide just punishment, and afford adequate deterrence.

        David Murcia-Guzman was the founder and head of DMG;
indeed, he named the company after himself.  From his leadership
position, the defendant was intimately involved with the day-to-
day operations of DMG, including the laundering of millions and
millions of U.S. dollars -- secured through illegal means --
through bank accounts and real properties located in the United
States.  For example, between March and May of 2008, as set forth
above, Murcia and his associates orchestrated the deposit of
approximately $2.2 million into an account at Merrill Lynch,
under the name "Blackstone International Development," which the
United States Government seized in May 2008 pursuant to a court
order.  To date neither Murcia nor his associates have raised any
claim for those funds, leading to the clear conclusion that, had

Hon. William H. Pauley III
May 7, 2011
Page 7

the defendant had *any* lawful claim to these ill-gotten funds, he or his associates at DMG would have come forward.

Further, in early 2008, at the direction of Murcia, his associate Margarita Leonor Pabon Castro accompanied another DMG employee, Daniel Angel Rueda, and others to Miami, Florida, in order to investigate the purchase of apartments that could be used as vehicles to launder additional ill-gotten DMG monies.  In all, the defendant's associates purchased approximately eight properties in the United States for DMG, including the properties listed for forfeiture in the Indictment.  Murcia personally approved the purchases of those properties and the arrangement by which the transfer of funds for the purchases would be made.  Additionally, in May 2008, Murcia and his associates caused approximately $3,000,000 to be wired to one of the defendant's associates, Santiago Barranchuk Rueda, in the United States via multiple wire transfers.  These funds were sent from around the world to accounts designated by Barranchuk in order to further DMG's goals.

These are but three examples of the Murcia's knowing use of the United States and its financial institutions to launder and conceal his ill-gotten proceeds.  And defendant's plea allocution confirms his use of the Black Market Peso Exchange to affect the laundering describe above:

> I had a holding company in Colombia, which consisted of over 10 businesses, and more than 5,000 employees.  I was the boss of all the businesses.  And I authorized some financial transactions, some of which I suspected involved the proceeds of illegal activities.  When buying in dollars on the black market, I authorized the transaction which was carried out by one of my employees. . . . And the transaction wound up in the United States and in order to buy some properties. . . . I authorized those transactions.

(Plea Transcript dated November 23, 2010, at 16-19).  Further, the defendant admitted to *not* investigating the origin of the funds sent into various bank accounts in the United States because he suspected that, if he looked into it, he would

Hon. William H. Pauley III
May 7, 2011
Page 8

discover that the source of the funds was, in fact, illegal.
(*Id.* at 19).

      A substantial sentence is necessary in this case to
send a message to those who, like the defendant, choose to use
the United States as a conduit for the laundering of monies
tainted with illegality for their own profit and benefit -- a
message that greed and deception will not be tolerated under the
law.  And the defendant has pointed to no argument or basis that
could possibly support a variance from the Stipulated Guidelines
Range.  Accordingly, a sentence within the Stipulated Guidelines
Range of 108 to 135 months' imprisonment is sufficient, but not
greater than necessary, to meet the legitimate purposes of
sentencing, and such a sentence is required here.

### Conclusion

      For all these reasons, a sentence within the Stipulated
Guidelines Range is sufficient but not greater than necessary to
address the sentencing objectives under 18 U.S.C. § 3553(a).

               Respectfully submitted,

               PREET BHARARA
               United States Attorney

By:    *Benn*
               BENJAMIN NAFTALIS
               TELEMACHUS KASULIS
               MICHAEL LOCKARD
               Assistant United States Attorneys
               (212) 637-2456/-2411/-2193

cc:  Robert Abreu, Esq. (by e-mail)